IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

APR 0 7 2014

U.S. DISTRICT COURT-WVND
CLARKSBURG, WV 26301

LINDA J. MILLER,

        **Plaintiff,**

v.

                                      **Civil Action No. 5:13CV96**
                                      **(The Honorable Frederick P. Stamp, Jr.)**

COMMISSIONER OF SOCIAL SECURITY,

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "Commissioner") denying Linda J. Miller's ("Plaintiff") claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed her SSI application on February 17, 2011, alleging disability since January 11, 2008, due to heart condition, stent placement, chest pain, back pain, and chronic obstructive pulmonary disease ("COPD") (R. 67, 136, 157). The application was denied initially and upon reconsideration (R. 65-66). Plaintiff timely filed a request for a hearing, which Administrative Law Judge ("ALJ") Frances Kuperman held on October 10, 2012, and at which Plaintiff, represented by counsel, and David Humes ("VE") testified (R. 33-64). ALJ Kuperman issued a decision on October 17, 2012, finding Plaintiff was not disabled (R. 16-27). Plaintiff appealed this decision to the Appeals Council, and, on July 18, 2013, the Appeals Council upheld ALJ Kuperman's October 17,

2012, decision, in part, and found Plaintiff was disabled beginning October 17, 2012 (R. 1-8). Plaintiff filed the instant action on July 30, 2013, seeking review of the Commissioner's decision that she was not disabled from February 11, 2011, until October 17, 2012 (Plaintiff's brief at pp. 3-4).

## II. FACTS

Plaintiff was born on October 24, 1951, and was fifty-nine (59) years old on February 18, 2011, the date she filed her application (R. 36, 136). She completed seventh grade and did not obtain her GED (R. 37, 179). Plaintiff past work included that of laborer in a cold storage facility and at Goodwill and as a cashier. Plaintiff also held various jobs at the Charles Town Race Track, Wendy's and Pizza Hut (R. 161-68).

Plaintiff was diagnosed with thoracic back pain by a medical professional at Eastern Panhandle Free Clinic on May 4, 2010 (R. 262).

Plaintiff's May 11, 2010, chest x-ray showed "no definite evidence of acute cardiopulmonary process" (R. 253).

Dr. Nashed evaluated Plaintiff on May 20, 2010 for coronary artery disease with spasm. Plaintiff reported stress due to her daughter-in-law's having had a stroke; Plaintiff cared for her. Plaintiff reported daily chest pain (R. 243). Plaintiff was diagnosed with "likely" peripheral arterial disease due to smoking. Dr. Nashed ordered a stress echocardiogram ("ECG"), encouraged her to stop smoking, and prescribed Ativan for anxiety (R. 244).

Plaintiff presented to Nurse Practitioner ("N.P.") Holmaas at Eastern Panhandle Clinic on May 21, 2010, and reported she had been treated at Jefferson Hospital for a heart attack. She was positive for anxiety; her examination was normal. She medicated with nitroglycerin, Simvastatin, and Ativan

(R. 263). Plaintiff informed N.P. Holmaas at her June 18, 2010, appointment that she was "not ready to quit" smoking (R. 267).

Plaintiff presented to Winchester Medical Center, Inc., on June 3, 2010, with complaints of chest pain (R. 223). Her stress ECG showed good exercise tolerance, normal left ventricular function, no inducible ischemia, and trivial pericardial effusion (R. 224).

Dr. Webb completed a Disability Determination Examination of Plaintiff on September 30, 2010. Plaintiff reported chronic low back pain since 1991. Plaintiff had not had surgery, epidural injections, chiropractic therapy, or physical therapy for her back pain. She was to "start" massage therapy "in the near future." Plaintiff stated her pain radiated across her low back and into the left posterior iliac crest area. She experienced occasional numbness below her left knee (R. 226). Plaintiff reported she had one stent inserted in 2008; one catheterzation and an angioplasty in August 2008; and a catheterzation and stent inserted in December 2008. She continued to have chest pains, which occurred daily and were not exertional. Plaintiff reported she medicated with Lipitor, baby aspirin, over-the-counter sleeping pills, and nitroglycerin. Plaintiff smoked one-and-one-half (1 ½) packages of cigarettes per day (R. 227).

Plaintiff stated she had been "under a lot of stress" because her husband had lost his job. Her weight varied; she had chronic intermittent cough; she had reflux symptoms; she had no "kidney problems"; she was depressed; she had difficulty sleeping. Upon examination, Plaintiff's blood pressure was 135/80 and she could stand up from a seated position (R. 227). Her neck was "okay." Her chest and lungs were clear; there was a "soft systolic murmur at the right upper sternal border"; her abdomen was normal. Plaintiff had no ankle edema; she had "good DP pulses," tenderness at her left posterior lateral iliac crest, no paralumbar muscle spasm, good knee and ankle reflexes. She could

3

squat; she could heel/toe walk; her gait was stable; her straight leg raising test was negative; her range of motion was normal; her motor exam was normal; her fine manipulation of her fingers was normal. Plaintiff had back pain with full range of motion of her lumbar spine. Dr. Webb noted Plaintiff's July, 2010, electrocardiogram showed "RVH with strain versus an old posterior wall infarction pattern." His impression was for "history of atypical chest pain with coronary artery disease," low back pain, tobacco abuse, "possible" COPD, situational stress and depression, and systolic murmur (R. 228).

The September 30, 2010, lumbar spine x-ray showed "mild degenerative changes; no definite alignment abnormalities . . . . Degenerative changes consistent of small anterior osteophytes" (R. 230).

During Plaintiff's October 19, 2010, pulmonary testing, she had a "difficult time following commands," chest pains, and shortness of breath. She was advised to go to the emergency department but she refused. She was diagnosed with "mild restriction - possible" (R. 231-32).

Plaintiff was evaluated at Eastern Panhandle Free Clinic by N.P. Holmaas on January 3, 2011, for osteoporosis. She had back pain; her other examinations were normal (R. 277). She had diminished breath sounds. She was prescribed Nitroglycerin and Pravastatin (R. 278).

Plaintiff's January 8, 2011, lumbar spine x-ray showed "mild degenerative changes within the lumbar spine" that were "stable compared to the prior study of 9/30/10. No new focal findings." Her dexa scan showed normal lumbar bone density and bilateral femoral neck (R. 250-51, 310-11).

Plaintiff was treated at Eastern Panhandle Free Clinic on February 2, 2011, for COPD and coronary artery disease. She stated she smoked and was under stress due to unemployment. She was counseled to stop smoking and told she "need[ed]" nicotine patches (R. 305).

Plaintiff's March 2, 2011, chest x-ray was "normal" (R. 252, 302).

Plaintiff presented to Eastern Panhandle Free Clinic on March 7, 2011, for follow up to her March 2, 2011, emergency room admission. Plaintiff reported chest pain to N.P. Holmaas. She was not diaphoretic, short of breath, or nauseated. Her examination was normal, except for diminished breath sounds. She medicated with hydrocortisone, Lisinopril, Metoprolol Tartrate, nitroglycerin, and Pravastatin (R. 280-81).

Plaintiff was examined by Dr. Nashed on March 14, 2011, relative to her chest discomfort. Plaintiff reported daily chest pain that felt "sharp" and "heavy." Her pain was nonexertional and was "oftentimes associated with increased stress." Plaintiff was "under a lot of stress" due to her divorce. Plaintiff stated her "left leg [got] jumpy at times," she had right arm numbness, she was forgetful. Upon examination, Dr. Nashed found the examinations of Plaintiff's neck, heart, lungs, abdomen, and extremities were normal. Her blood pressure was 138/82 (R. 241). Dr. Nashed found Plaintiff's hypertension was not well controlled and increased Plaintiff's dosage of Imdur and Lisinopril (R. 242).

Plaintiff was treated at Eastern Panhandle Free Clinic on April 4, 2011 by N.P. Holmaas. Plaintiff's examinations were normal, except she was positive for diminished breath sounds in her lungs. She was diagnosed with, inter alia, COPD, coronary heart disease, hyperlipidemia, hypertension, and tobacco abuse and prescribed Lisinopril, Imdur, nitroglycerin, and Metoprolol Tartrate (R. 282-83).

On April 11, 2011, Plaintiff reported to N.P. Cook, at Eastern Panhandle Free Clinic, that she had been admitted to the hospital on April 7, 2011, for chest pains. Plaintiff stated she was informed at the hospital that her symptoms were "probably related to stress as cardiac origin ruled out." She was positive for gastroesophageal reflux disease ("GERD"); her examinations were otherwise normal. N.P. Cook prescribed Imdur, Lipitor, Toprol, and Accupril (R. 285-85).

Dr. Gajendragadkar completed a Physical Residual Functional Capacity Assessment of Plaintiff on April 23, 2011. Dr. Gajendragadkar found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for a total of about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 255). Plaintiff could never climb ladders, ropes, and scaffolds. She could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl (R. 256). Dr. Gajendragadkar found Plaintiff had no manipulative, visual, or communicative limitations (R. 257-58). Dr. Gajendragadkar found Plaintiff's exposure to wetness, humidity and noise was unlimited. Plaintiff should avoid concentrated exposure to extreme cold and heat, vibration, fumes, odors, dusts, gases, and poor ventilation. Plaintiff should avoid even moderate exposure to hazards (R. 258). Dr. Gajendragadkar noted Plaintiff had no problem with her personal care, prepared simple foods, shopped for groceries, walked for thirty (30) minutes, and could lift ten (10) pounds. Plaintiff could clean floors, which "aggravate[d] back" (R. 259).

On May 3, 2011, Joseph A. Shaver, Ph.D., completed a Psychiatric Review Technique of Plaintiff. Dr. Shaver found Plaintiff had a non-severe anxiety-related disorder (R. 320, 325). Dr. Shaver found Plaintiff had mild limitations in her activities of daily living, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace (R. 330). Dr. Shaver considered Plaintiff's May 20, 2010; September 30, 2010; and March 14, 2011 medical records. Dr. Shaver also noted Plaintiff could care for her personal needs, could prepare simple meals, cleaned floors, shopped for groceries, handled finances, watched television, cared for her grandson, and reported no difficulties with her memory, concentration, or understanding (R. 332).

Plaintiff presented to the emergency department at Jefferson Memorial Hospital on May 31, 2011, with chest pain; otherwise, her examination was normal (R. 363, 365). Her heart sounds, cardiac arteries, and heart rate and rhythm were normal (R. 363). Her ECG showed abnormal "ST & T" wave and normal sinus rhythm (R. 373). Her chest x-ray was normal (R. 375). Her symptoms were treated with nitroglycerin (R. 366). Plaintiff was offered admission, but she refused (R. 364).

Plaintiff was admitted to Jefferson Memorial Hospital on June 2, 2011, for chest pain, which she described as sharp and dull. She was positive for shortness of breath, diaphoresis, palpations, right arm numbness, and non-productive cough. Dilaudid relieved her pain in the emergency room (R. 349). Her ECG showed "ST & T wave abnormality." Her sinus rhythm was normal (R. 351-52). Upon examination, Plaintiff's breath sounds were normal; she was alert; her gait was normal; her strength was normal. Cardiovascularly, Plaintiff's pulses were strong and regular, her capillary refill was normal, and she had no edema (R. 356). Her chest x-ray was normal (R. 374). Plaintiff was transferred to Winchester Memorial Hospital on June 3, 2011, for a cardiac catheter (R. 349).

Dr. Lakhani completed a consultative cardiology examination of Plaintiff on June 3, 2011. Dr. Lakhani noted Plaintiff had been treated at the emergency department of Jefferson Memorial Hospital four (4) times "in the past few months." Plaintiff reported chest heaviness and pain, "some" paresthesias in her right arm, and shortness of breath. Dr. Lakhani noted Plaintiff's EKG showed "some nonspecific anterior T-wave inversions." Plaintiff stated she smoked one-half (½) package of cigarettes per day (R. 338). Dr. Lakhani noted Plaintiff had a left heart catheterzation on April 14, 2003, January 11, 2008, and August 2009; a normal cardiolite stress test in April 2008; and a normal exercise treadmill test on January 10, 2011 (R. 338-39). Plaintiff denied headaches, scotomata, dysphagia, orthopnea, frequent heartburn, hematuria, or edema (R. 339). Upon examination, Dr.

Lakhani found Plaintiff's blood pressure was 136/111 and she was in no acute distress. Dr. Lakhani's examination of Plaintiff's skin, head, ears, neck, throat, chest, lungs, heart, abdomen, and extremities produced normal results. Neurologically, she was grossly intact. Dr. Lakhani's impressions were for recurrent chest pain, hypertensive cardiovascular disease, dyslipidemia, COPD, GERD, and history of depression (340). He performed a left heart catheterzation. He found "non-obstructive coronary artery disease with normal LV function." Plaintiff had normal ejection fraction. Her left ventricular systolic function was normal. Dr. Lakhani noted the "pain probably was non-cardiac." Dr. Lakhani increased Plaintiff's dosage of Imdur (R. 342-45, 347).

Harold D. Slaughter, M.S., a licensed psychologist, completed a West Virginia Disability Determination Service Mental Status Examination of Plaintiff on July 11, 2011. Plaintiff stated her chest pain began in 2008. She experienced pain daily; was fatigued; had a stent placed in January 2008, and replaced in December 2008; and had a catheter inserted in June 2011. She hurt her back in 1993. Plaintiff reported she had attempted suicide twice in 2006, but she did not "feel[] that way now." She was depressed, had crying spells, had increased irritability, and was anxious and worried. She had normal appetite and no panic attacks, compulsions, or phobias (R. 379).

Upon examination, Mr. Slaughter found Plaintiff's appearance was appropriate; her attitude and behavior were cooperative, but "tearful at times"; and her speech, thought content, thought process, insight, and psychomotor behavior were normal. She was oriented. Her mood was mildly depressed and affect was broad. Plaintiff's judgment was average. Plaintiff's immediate memory and remote memory were normal; her recent memory was moderately deficient. Plaintiff's persistence was normal; her concentration was mildly deficient. Mr. Slaughter found Plaintiff's social functioning was mildly impaired. Plaintiff did not "go out" when it was hot; she did not attend church; she did not eat

in restaurants; she visited her daughter. Plaintiff reported her activities of daily living as follows: rose between 6:00 a.m. and 7:00 a.m., attempted to clean either her trailer or her daughter's house. She took frequent breaks. She stated she had daily chest pain and her "back problems cause[d] her difficulty with bending, lifting, carrying, stooping, etc." (R. 380). Mr. Slaughter diagnosed mood disorder due to chronic pain. Her prognosis was fair and she could manage her finances (R. 381).

Dr. Franyutti reviewed the medical evidence of record on July 14, 2011, and found "no change of RFC needed" (R. 382).

Jeff Boggess, Ph.D., completed a Psychiatric Review Technique of Plaintiff on July 29, 2011 (R. 391). Plaintiff was positive for an anxiety-related disorder, which was identified as a mood disorder, secondary to a physical condition and anxiety (R. 396). Dr. Boggess found Plaintiff had mild limitations in her activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, and pace (R. 401).

On August 6, 2011, Dr. Caudill reviewed Dr. Gajendragadkar's April 23, 2011, Physical Residual Functional Capacity Assessment and agreed with same (R. 410-11). The next day, Dr. Harper also reviewed and agreed with the same.

Plaintiff established care with Dr. Bosley on August 12, 2011. Plaintiff reported chronic chest pain. She treated it with four (4) baby aspirin and relaxation, which caused the pain to "go[] away." Plaintiff stated she did not treat her chest pain with nitroglycerin. Plaintiff reported Dr. Nashed informed her that her chest pain was not "her heart." Plaintiff reported she became dizzy when she stood; she had no syncope (R. 421). Plaintiff reported she was married and had smoked for thirty-eight (38) years. Dr. Bosley's examinations of Plaintiff's eyes, head, ears, nose, throat, neck, cardiovascular system, extremities, lungs, abdomen, skin, neurologic system, and lymphatic system were normal. She

was oriented and her behavior, affect, memory, thought content, judgment, and speech were normal (R. 423). Dr. Bosley diagnosed coronary artery disease, stable; GERD, stable; hypertension; COPD, stable; orthostatic hypotension, and hyperlipidemia (R. 423-24).

Dr. Mays examined Plaintiff on September 6, 2011, relative to chest pain, for which Plaintiff reported she had sought treatment at an emergency department. Plaintiff continued to smoke one-half (½) package of cigarettes per day. She stated her depression was "better since starting [Z]oloft" but could "still be improved." Plaintiff stated she treated her chest pain that morning with nitroglycerin, which "relieved" it. Dr. Mays' examination of Plaintiff was normal. Dr. Mays diagnosed Plaintiff with coronary artery disease, GERD, hypertension, hyperlipidemia, and COPD. Plaintiff medicated with Imdur, Accupril, Lipitor, Pepcid, Ultracet, Zoloft, Dexilant, and nitroglycerin (R. 418-19).

Plaintiff's September 14, 2011, ECG showed "normal systolic function, no evidence of diastolic relaxation abnormality, and only trace mitral regurgitation" (R. 416).

Plaintiff presented to the emergency department of Jefferson Memorial Hospital on October 12, 2011, with complaints of chest pain. Her examination was normal (R. 433-35). She was treated with nitroglycerin (R. 441). Her ECG showed normal sinus rhythm, possible left atrial enlargement, a "suggest[ion] [of] right ventricular conduction delay, and abnormal ST&T wave" (R. 443). There was no significant change in the ECG compared to the September 4, 2011 ECG, and her chest x-ray was normal and "stable compared to the . . . 9/3/11" study (R. 444-45). She reported she stopped smoking three (3) weeks earlier; she was released to home, her spouse transported her (R. 438, 450).

Dr. Rajah examined Plaintiff on October 17, 2011, as a follow-up to her emergency department visit. Dr. Rajah noted a cardiac catheter showed "30% block in one of the arteries" and conservative management treatment was "advised" by Dr. Nashed. Plaintiff stated she had not been told about the

blockage and "her lawyer is looking into to see if the blockage was there before this recent cath." Plaintiff requested a second opinion with another cardiologist. Plaintiff's GERD, hypertension, hyperlipidemia, depression, and COPD were "stable" with medications. Plaintiff denied chest pain, shortness of breath, depression, or leg swelling. Dr. Rajah noted Plaintiff's September 14, 2011, ECG showed sixty (60) percent ejection fraction, no regional wall motion abnormalities, normal systolic function, trace mitral regurgitation, and no evidence of diastolic relaxation abnormality. Plaintiff's examination was normal. Dr. Rajah diagnosed chest pain, coronary artery disease, GERD, hypertension, and hyperlipidemia (R. 538).

Plaintiff reported to the emergency department of Jefferson Memorial Hospital on November 1, 2011, with "stable angina." Her examination was normal (R. 513-14, 516). She was medicated with nitroglycerin, Dilaudid, and Zofran (R. 517). Plaintiff's chest x-ray was normal and "stable compared to the prior study of 10/12/11" (R. 524). Her condition improved; her husband collected her (R. 519).

Dr. Srivastava examined Plaintiff on November 4, 2011, relative to an emergency room visit for chest pain. Plaintiff reported difficulty sleeping. Dr. Srivastava's examination showed chest pain and dizziness (R. 536). Plaintiff was positive for chest tenderness, but her pulmonary, cardiovascular, abdominal, and musculoskeletal examinations produced normal results. Dr. Srivastava diagnosed coronary artery disease, GERD, insomnia, and chest pain. She was advised to stop drinking caffeinated beverages and drink more water (R. 537).

Plaintiff presented to the emergency department of Jefferson Memorial Hospital on November 15, 2011, with complaints of chest pain (R. 500-01). Plaintiff was anxious. Her examination was normal (R. 502). She was stable, released to home, and her spouse collected her (R. 505).

Plaintiff presented to the emergency department of Jefferson Memorial Hospital on November 27, 2011, with complaints of chest pain and anxiety. Except for noting a previous dog bite, Plaintiff's examinations were normal (R. 483-85). Plaintiff was treated with Pepcid (R. 486, 491). Plaintiff was released to home; she was stable; her husband collected her (R. 488).

Plaintiff was examined by Dr. Srivastava for chest pain "follow up" on December 4, 2011 (R. 533). Plaintiff reported difficulty sleeping, which she treated with over-the-counter sleeping aids. Except for chills, lesions on her body, and diaphoresis, Plaintiff's systems were normal. Dr. Srivastava found Plaintiff's musculoskeletal, cardiovascular, and psychiatric examinations were normal (R. 534). Dr. Srivastava diagnosed GERD, chest pain, and staph infection (R. 535).

Plaintiff presented to Jefferson Memorial Hospital's emergency department on December 27, 2011, with complaints of "sharp, shooting" pain in her chest wall (R. 473). Her examination was normal (R. 474). Plaintiff was treated with Percocet (R. 476, 481). When stable, Plaintiff was released to home; her husband collected her (R. 478).

Plaintiff presented to Jefferson Memorial Hospital's emergency department on December 30, 2011, with complaints of chest pain and dizziness. Her examination was normal (R. 463). She was treated with nitroglycerin, Toradol and Protonix (R. 468, 471). She reported she was pain free (R. 465-66). Plaintiff was discharged to home; her spouse collected her; she was stable (R. 468).

Plaintiff was admitted to Jefferson Memorial Hospital on January 29, 2012, for complaints of chest pain. Dr. Zavala found Plaintiff had "been doing well, besides for constant pain in her chest." Dr. Zavala noted that Plaintiff's "etiology at this time is GI." Plaintiff reported her chest pain was located "substernally with radiation into her left and right lungs." Nitroglycerin did not improve her symptoms (R. 453). Her pain was controlled with Percocet. Plaintiff's troponins and "other cardiac

enzymes" were negative; her ECG was "unchanged." Plaintiff's vital signs were within normal limits. Her laboratory results were normal; her physical examination was "benign." Plaintiff was discharged on January 30, 2012. She was stable and could resume normal activities without restriction (R. 454).

Plaintiff presented to Dr. Mays on February 20, 2012, for "emergency room follow up." Plaintiff reported she had been prescribed Carafate; she had no improvement of symptoms. Plaintiff reported she stopped smoking. Dr. Mays' review of systems produced normal results (R. 528). Dr. Mays' cardiovascular, abdominal, musculoskeletal, and psychiatric examination of Plaintiff were normal. Plaintiff was diagnosed with GERD and prescribed Carafate (R. 529).

Dr. Mays examined Plaintiff on March 2, 2012. Plaintiff reported she stopped smoking five (5) months earlier (R. 525). Plaintiff's heart and lung examinations were normal. Her affect was appropriate. Her ranges of motion were normal. Dr. Mays diagnosed coronary artery disease, hypertension, GERD, hyperlipidemia, chest pain, and COPD (R. 526).

Plaintiff was admitted to Jefferson Memorial Hospital on March 14, 2012, for chest pain (R. 540). Her examination was normal (R. 541). Plaintiff complained of nausea and vomiting for one (1) week. Her chest x-ray was normal and "stable" compared to the prior study. Plaintiff reported she had been told, by her cardiologist, that she had a thirty (30) percent blockage near her stent and he did not "believe" her chest pain had "been cardiac in origin." Plaintiff's ECG was "unremarkable" in 2011; her stress test was normal. Dr. Rajah noted Plaintiff's depression and anxiety was not "well controlled." Plaintiff reported increased stress due to "personal and financial" situations (R. 542). Plaintiff was discharged on March 15, 2012, as stable. She was prescribed Zofran and Ativan and instructed to make an appointment with her primary care physician and cardiologist (R. 543).

Plaintiff presented to the emergency department of West Virginia University Hospital - East on July 25, 2012, with complaints of chest pain. Plaintiff was treated with nitroglycerin and aspirin, which resolved her pain. Plaintiff smoked. Dr. Williamson's review of Plaintiff's systems was normal (R. 588). Her examination was normal. Plaintiff's blood count, comprehensive metabolic profile, troponin, "CPK," cardiac enzymes, coagulation studies, and chest x-ray were normal. Her ECG showed "some T-wave inversion." Dr. Willamson diagnosed atypical chest pain; Plaintiff was released to home (R. 589).

Plaintiff was admitted to West Virginia University Hospital - East on July 31, 2012, for chest pain caused by chasing her dogs (R. 594, 596). Plaintiff's stress test was normal (R. 595). It was noted Plaintiff had been a patient at the emergency department at Jefferson Memorial Hospital on July 30, 2012, because she became dizzy, fell, and struck her tail bone (R. 596). Plaintiff's examination was normal (R. 598, 601-02, 610). She was diagnosed with chest pain, chronic kidney disease, back pain, anxiety, coronary artery disease, stable hypertension, hyperlipidemia, stable COPD, and stable GERD. She medicated her back pain with Percocet (R. 598-99). Plaintiff's myocardial perfusion study was normal; her ejection fraction was sixty-eight (68) percent; she had no focal dyskinesia (R. 600). Plaintiff's EKG showed "no acute cardiopulmonary disease" (R. 611). She was discharged to home on August 1, 2012 (R. 612).

Plaintiff was admitted to Jefferson Memorial Hospital on August 20, 2012, for chest pain. Plaintiff's husband reported she had been "very upset and tearful before the chest pain episode began." Plaintiff described the pain as sharp and stabbing. Plaintiff had no nausea, shortness of breath, or diaphoresis. Plaintiff medicated with two (2) nitroglycerin tablets and four (4) baby aspirin prior to presenting to the hospital (R. 546). Dr. Oglesby's review of Plaintiff's systems showed headaches,

sore throat, chest pain, shortness of breath, chronic back pain due to a "'buldging (sic) disk on left side'" and bladder prolapse (R. 548). Upon examination, Dr. Oglesby found Plaintiff's lungs were positive for decreased air entry, bilaterally; the rest of the examination produced normal results (R. 549). Plaintiff was diagnosed with chest pain, anxiety, COPD, hypertension, and GERD (R. 550-51). Plaintiff was tearful and "reported feeling suicidal, without a plan." An appointment was made with a therapist. Plaintiff was discharged on August 21, 2012 (R. 551).

Administrative Hearing

At the October 10, 2012, administrative hearing, Plaintiff testified she completed the seventh grade, could read and write, and could drive (R. 37). Plaintiff testified she could not sit for "very long" and had to change positions every ten (10) minutes due to back pain. She could stand for fifteen (15) minutes (R. 45). She could lift a gallon of milk and a "basket of clothes." Walking produced back pain; she could walk one-half (½) a mile (R. 46). Plaintiff reported that sweeping caused back pain (R. 47).

Plaintiff reported she had undergone a heart catheterzation three (3) times in one (1) year. Plaintiff stated she had back pain (R. 39). Plaintiff reported she had stopped smoking in September, 2012. Plaintiff was being treated by a psychiatrist (R. 40). Plaintiff reported she took medication for anxiety, back pain, chest pain (R. 41-2). Plaintiff testified she had sought treatment at emergency departments seventeen (17) times in the past year for chest pain and back pain. She testified she also had thoughts of suicide during an emergency room visit (R. 43). Plaintiff stated she became dizzy and had "blackout spells" (R. 47). Both caused her to fall (R. 48). Her "dizzy spells" began one (1) month earlier. Plaintiff reported she was "tired all the time." Plaintiff could not nap; she took sleeping aids; she woke at night and could not return to sleep (R. 49).

The ALJ asked the VE to consider the following hypothetical:

Assume an individual with the claimant's vocational profile along with the ability to do light work, but she can never climb ladders, ropes, scaffolds, and she can do all the posturals – stooping, balancing, bending, crawling, crouching occasionally; she needs to avoid concentrated exposure to temperature extremes, respiratory irritants, vibrations, hazards; the work needs to be routine and unskilled (R. 60).

The VE responded there were jobs of fast food cashier and housekeeper (R. 60-61).

## III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Kuperman made the following findings:

1.      Social Security records report earnings after February 18, 2011, the application date (20 CFR 416.971 *et seq.*)  These earnings may constitute Substantial Gainful Activity.

2.      The claimant has the following severe impairments: coronary artery disease, status post stent placement three times with angioplasty; atypical chest pains; chronic obstructive pulmonary disease[;] moderate chronic kidney disease[;] back pain and affective disorder/anxiety (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926) (R. 18).

4.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 4416.967(b) except the claimant can never climb ladders, ropes and scaffolds, but can occasionally balance, stoop, kneel, crouch, crawl and climb ramps or stairs.  She must avoid concentrated exposure to temperature extremes, vibration, hazards and respiratory irritants.  She is limited to performing routine, rote and unskilled tasks (R. 20).

5.      The claimant is capable of performing past relevant work as a Fast Food Cashier.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965) (R. 26).

6.   The claimant has not been under a disability, as defined in the Social Security Act, since February 18, 2011, the date the application was filed (20 CFR 416.920(f)) (R. 27).

## IV.  DISCUSSION

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law:  "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

Plaintiff contends:

1.   Both the Appeals Council and the ALJ made erroneous determination of Plaintiff's residual functional capacity at Step Four (Plaintiff's brief at pp. 11-13).

2.   The ALJ's analysis of Plaintiff's credibility is based on erroneous fact finding and reasoning  (Plaintiff's brief at pp. 13-14).

3. The ALJ failed to consider that Plaintiff met the definition of a "'person close to retirement'" (Plaintiff's brief at pp. 14-15).

The Commissioner contends:

1. Substantial evidence supports the ALJ's credibility findings (Defendant's brief at pp. 12-14).

2. Plaintiff's age was not a relevant factor for the purposes of "this Step Four Case" (Defendant's brief at pp. 14-15).

## C. RFC

Plaintiff first alleges that the ALJ erred in formulating her RFC by "examining each of [her] limitations individually without considering the effect each limitation may have on the other and in combination with one another." (Plaintiff's Brief at 13.) Defendant asserts that "the ALJ considered the combined effect of Plaintiff's impairments at the second, third, and fourth steps of the sequential evaluation process." (Defendant's Brief at 14.)

In support of her argument, Plaintiff cites two guidelines from the Administration's Program Operations Manual System ("POMS"). Even though it is not legally binding, the POMS is entitled to some deference because these guidelines "represent the Commissioner's interpretation of the governing statutes and regulations." Wilson v. Apfel, 81 F. Supp. 2d 649, 653 (W.D. Va. 2000); see also Danielson v. Astrue, No. 1:10-cv-125, 2011 WL 1485995, at *3 (N.D. W. Va. Mar. 29, 2011) (citing cases). Plaintiff cites POMS DI § 25225.010, which states:

> When we evaluate your functioning and decide which domains may be affected by your impairment(s), we will look first at your activities and your limitations and restrictions. Any given activity may involve the integrated use of many abilities and skills; therefore, any single limitation may be the result of the interactive and cumulative effects of one or more impairments. And any given impairment may have effects in more than one domain; therefore, we will evaluate the limitations from your impairment(s) in any affected domain(s).

<u>Available at</u> https://secure.ssa.gov/apps10/poms.nsf/lnx/0425225010.  Plaintiff also cites POMS

DI § 25210.015, which states:

> If you have more than one impairment, we will sometimes be able to decide that you
> have a "severe" impairment or an impairment that meets, medically equals, or
> functionally equals the listings by looking at each of your impairments separately.
> When we cannot, we will look comprehensively at the combined effects of your
> impairments on your day-to-day functioning instead of considering the limitations
> resulting from each impairment separately.  (See DI 22001.015 and DI 25225.010 for
> more information about how we will consider the interactive and cumulative effects
> of your impairments on your functioning.)

<u>Available at</u> https://secure.ssa.gov/apps10/poms.nsf/lnx/0425210015.

The undersigned finds that although the POMS is entitled to some deference, Plaintiff's

reliance on these guidelines is misplaced.  POMS DI § 25225.010 is the Administration's

interpretation of 20 C.F.R. § 416.926a(c), and POMS DI 25210.015 is its interpretation of 20 C.F.R.

§ 416.924a(b)(4).  These regulations govern determinations of disability and functional equivalence

for children.  <u>See generally</u> 20 C.F.R. § 416.924a (section entitled "Considerations in determining

disability for children"); 20 C.F.R. § 416.926a (section entitled "Functional equivalence for

children").  As an adult, Plaintiff cannot rely on these provisions for relief.

Nevertheless, the undersigned has considered whether the ALJ erred by not examining the

cumulative effect of her impairments when considering her RFC.  Under the Social Security Act,

a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's

physical and mental limitations.  20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).  "RFC is an

assessment of an individual's ability to do sustained work-related physical and mental activities in

a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or

an equivalent work schedule."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July

2, 1996).

The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974); see also Hines v. Bowen, 872 F.2d 56, 59 (4th Cir. 1989) (citations omitted) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments."). The cumulative effect that the various impairments have on a claimant's ability to work must be analyzed. See DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

The diagnosis of an impairment does not compel a finding of disability; rather, the impairment must prevent a claimant from performing any substantial gainful activity in the national economy. See 20 C.F.R. § 416.905(a). The undersigned finds that Plaintiff has not met her burden of proving that she was disabled during the relevant time period. In support of her argument that the ALJ failed to consider the cumulative effect of her impairments, Plaintiff states:

For example, the ALJ failed to recognize or consider the effect that prolonged coronary artery disease, including three heart catherizations, would have on continuing chest pain and COPD; or the effect that stress, anxiety and depression, strong enough to produce two suicide attempts, would have on chest and back pain, coronary artery disease and breathing problems.

(Plaintiff's Brief at 13.) However, Plaintiff has failed to demonstrate how such "cumulative effects" prevented her from any type of substantial gainful activity during that time. The ALJ considered all of Plaintiff's limitations in his RFC assessment by stating:

The claimant's testimonial description regarding the severity of her symptoms and limitations is unsubstantiated by the medical evidence of record. While treatment records establish the claimant's medical history is significant for coronary artery disease, subsequent diagnostic findings repeatedly document normal results. For example, chest x-rays taken in March, May, June, October and November 2011 all show normal findings (Exhibits 5F, 20F, 21F). In addition, an echocardiogram performed in September 2011 demonstrated normal systolic function, normal left ventricular function with an estimated ejection fraction of 60 percent and only trace mitral regurgitation (Exhibit 19F/3), while a myocardial perfusion scan performed in August 2012 showed normal findings along with normal ejection fraction of 68 percent (Attorney submitted evidence; City Hospital; July 31, 2012-August 1, 2012). By claimant's own admission, her chest pains were resolved with taking baby aspirins coupled with nitroglycerine (Exhibit 19F; Attorney submitted evidence; City Hospital; July 31, 2012-August 1, 2012). Moreover, hospital treatment records reflect the claimant's treatment course remained essentially conservative in nature consisting primarily of medication. The lack of more aggressive treatment or even a referral to a specialist suggests the claimant's symptoms and limitations are not as severe as she alleged.

While X-rays taken of the claimant's lumbar spine showed mild degenerative changes (Exhibit 3F), claimant's posture and gait were described as normal and a straight leg raising test showed negative findings. Her motor strength and fine manipulation abilities were also assessed within normal limits (Exhibit 2F). The claimant testified and treatment records confirm that surgical intervention has not been recommended for this condition, nor has the claimant received epidural injections, physical therapy or chiropractic care for this condition (Exhibit 2F). In August 2012, hospital treatment records reflect the claimant's reports that her back pain was relieved with Percocet (Attorney submitted evidence; City Hospital; July 31, 2012-August 1, 2012). I have only found this impairment severe because of possible side effects of the narcotic Percocet, none of which the claimant testified to.

Although the claimant was diagnosed with COPD, pulmonary testing showed evidence of only mild restriction and the claimant testified she is not currently using any prescribed medication for this condition (Exhibit 4F; Hearing Testimony). The record evidence reflects she was also prescribed medication for her complaints of reflux (Exhibit 7F). Thus, the medical evidence demonstrates the claimant has been prescribed medication which has been relatively effective in the [sic] controlling the disabling symptoms she alleged.

Nevertheless, I find the claimant has some limitations resulting from her impairments. I have reduced the claimant's residual functional capacity to the light exertional level with occasional postural limitations to account for the claimant's physical impairments. Environmental limitations were also imposed to [sic] given the claimant's diagnosis with COPD. Furthermore, I have restricted the claimant to performing simple, routine and repetitive tasks in light of the concentration deficits she exhibited during her consultative examination with Dr. Slaughter. Therefore, I conclude that while the claimant's impairments are severe, they do not preclude all forms of work activity.

(R. at 24-25.) Given this discussion, the undersigned finds that the ALJ's RFC finding accounts for all of Plaintiff's functional limitations that were established in the administrative record and that substantial evidence supports the ALJ's evaluation of Plaintiff's impairments. Accordingly, the undersigned further finds that Plaintiff's argument is without merit.

### D. Credibility

Plaintiff next asserts that the "ALJ's analysis of [her] credibility is also based upon erroneous fact finding and reasoning." (Plaintiff's Brief at 13.) Defendant argues that substantial evidence supports the ALJ's credibility finding. (Defendant's Brief at 12-14.)

The ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." See Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) (citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983)); see also Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations

concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). This Court has noted that "[a]n ALJ's credibility determinations are 'virtually unreviewable.'" Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010 (Seibert, Mag. J.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit developed a two-step process for determining whether a person is disabled by pain or other symptoms. That process is as follows:

> First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged.*" . . . Therefore, for pain to be found disabling, there *must* be show a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers.* The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce" the actual pain, in the amount and degree, alleged by the claimant.
>
> . . .
>
> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. . . . Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings . . .; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) . . .; and any other evidence relevant to the severity of the impairment,

23

such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it . . . .

Id. at 594-95 (internal citations omitted). An ALJ "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2) (alterations in original). Social Security Ruling ("SSR") 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific enough reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." Id. at *2.

As to Plaintiff's credibility, the ALJ stated:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity.

(R. at 24.) Neither Plaintiff nor Defendant dispute the ALJ's determination as to the first step of the Craig analysis. Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms. See Craig, 76 F.3d at 585.

A review of the record reveals that the ALJ complied with both Craig and SSR 96-7p. First, the ALJ discussed Plaintiff's daily activities as follows:

> [D]uring the hearing, the claimant testified to performing limited daily activities; however, the documentary evidence contravenes the claimant's testimony. The undersigned reviewed and considered the Function Reports completed by the claimant on March 26, 2011 and June 9, 2011, respectively. Therein, the claimant indicated she is able to attend to her personal care and grooming independently. She further indicated she is able to prepare simple meals as well as perform housecleaning and laundry chores but with complaints of back pain. She reported she is able to travel independently, shop in stores, pay bills, count change and watch her grandson. During her daughter's absence, the claimant indicated she occasionally takes care of her daughter's dog. She also stated she is able to drive but she does not have a car. . . . Additional treatment records document claimant's reports that she cared for daughter-in-law who suffered a stroke . . .; however, upon questioning, the claimant denied such reports. Consultative examiner, Dr. Slaughter notes claimant's reports that she attempts to do some cleaning at her daughter's house . . . . Therefore, the claimant's self-reported daily activities suggest a greater physical capacity than she has alleged and is compatible with the residual functional capacity assessed herein.

(R. at 25-26.) The ALJ also considered the location, duration, frequency, and intensity of Plaintiff's pain and symptoms, and her functional limitations and restrictions:

> [Plaintiff] has alleged disabling limitations imposed by a combination of physical and mental impairments including recurring chest pains, back pain, a heart condition

along with depression and anxiety. According to the claimant, she underwent three cardiac catherizations during 2008. At the hearing, she testified that she experiences ongoing chest pains three times per day. She reported constant back pain, which she attributes to a bulging disc. . . . Although she attested to difficulty breathing, she also testified to a thirty-year history of smoking cigarettes. . . . She stated she experiences anxiety and depression but added she commenced psychiatric treatment about two months prior to this hearing.

(R. at 21.) Furthermore, the ALJ discussed factors that aggravate Plaintiff's symptoms by stating:

> Regarding her functional capabilities, the claimant indicated she has difficulties sitting, standing or walking for prolonged periods. She estimated that she is able to sit for about 10 minutes before requiring to change positions due to back pain. She said she is able to stand for about 15 minutes before experiencing discomfort.
>
> . . .
>
> Although she attempts to perform housecleaning chores or sweeping, she said these activities aggravate her back pain.

(Id.)

The ALJ also discussed the medication Plaintiff takes or has taken to alleviate her pain and symptoms:

> Although the claimant endorsed occasional chest pains in September 2010, she reported her symptoms were relieved by taking nitroglycerin.
>
> . . .
>
> The claimant presented before consultative examiner, Robert Webb, M.D., on September 30, 2010 for a physical evaluation. . . . She reported that for severe pain she takes two nitroglycerin tablets, which may gradually help to ease her symptoms. She reported she experiences reflux symptoms but takes over the counter Pepcid for this condition. . . . Her medication at that time consisted of Lipitor, baby aspirin, over the counter sleeping pills and nitroglycerin which she stated she took several times per month.
>
> . . .
>
> A discharge summary indicates the claimant was hospitalized overnight from June 2, 2011 through June 3, 2011. . . . Although she attested to experiencing frequent chest pains, she reported this pain resolved spontaneously with taking aspirin but

otherwise, she sought emergency care. While in the emergency room, the claimant was administered Dilaudid which relieved her pain.

. . .

By August 2011, office treatment reports reflects [sic] the claimant endorsed continued chest pains but added that she takes four baby aspirin followed by relaxation, which causes her symptoms to dissipate.

. . .

The claimant was admitted for hospital care on January 29, 2012 and released on January 30, 2012 regarding complaints of chest pains; however, she noted she was otherwise doing well. . . . According to the record, the claimant's symptoms were relieved with Percocet.

. . .

Additional treatment records reflect the claimant's complaints of ongoing anxiety and depression. In September 2011, she reported improvement in her mood since starting Zolaft.

. . .

By claimant's own admission, her chest pains were resolved with taking baby aspirins coupled with nitroglycerine. . . . Moreover, hospital treatment records reflect the claimant's treatment course remained essentially conservative in nature consisting primarily of medication.

. . .

In August 2012, hospital treatment records reflect the claimant's reports that her back pain was relieved with Percocet.

(R. at 22-24.) The ALJ also noted Plaintiff's "lack of more aggressive treatment or even a referral to a specialist" and that "the medical evidence demonstrates the claimant has been prescribed medication which has been relatively effective in . . . controlling the disabling symptoms she alleged." (R. at 24.) Furthermore, he stated that despite her lower back pain, "surgical intervention

was never recommended, and she has not received epidural injections, physical therapy or chiropractic care for her back condition." (R. at 22.)

The ALJ then provided a thorough discussion of the medical evidence which is inconsistent with Plaintiff's subjective complaints. Although Plaintiff had previously been diagnosed with coronary artery disease, several chest X-rays showed unremarkable findings. (See R. at 252-53, 302, , 374, 375, 444-45, 524, 589.) On June 3, 2010, Plaintiff's stress ECG showed good exercise tolerance, normal left ventricular function, no inducible ischemia, and trivial pericardial effusion. (R. at 224.) On June 2, 2011, Plaintiff was admitted to Jefferson Memorial Hospital for chest pain. (R. at 349.) Upon examination, Plaintiff's pulses were strong and regular, her capillary refill was normal, and she had no edema. (R. at 356.) The next day, after Dr. Lakhani performed a left heart catheterization on Plaintiff, he noted that Plaintiff had "non-obstructive coronary artery disease with normal LV function," normal ejection fraction, and left normal left ventricular systolic function. (R. at 342-45.) Furthermore, Plaintiff's September 14, 2011 ECG showed "normal systolic function, no evidence of diastolic relaxation abnormality, and only trace mitral regurgitation." R. at 416.) Plaintiff's October 12, 2011 ECG had no significant change when compared to the September 14, 2011 ECG. (R. at 444-45.) Finally, several of Plaintiff's examinations relative to chest pain were normal. (See R. at 463, 474, 483-85, 502, 513-14, 534, 541, 549, 589, 598.) As to Plaintiff's July 31, 2012 admission to West Virginia University Hospital–East for chest pain, the ALJ noted that Plaintiff had developed chest pains after chasing her dogs. (R. at 594, 596.)

The ALJ also discussed the consultative examination Dr. Webb performed on Plaintiff on September 30, 2010. Dr. Webb found that Plaintiff could stand up from a seated position. (R. at 227.) Her chest and lungs were clear, but there was a "soft systolic murmur at the right upper

sternal border." (R. at 228.) She had some tenderness at her left posterior lateral iliac crest but no paralumbar muscle spasm. (Id.) Plaintiff could squat and heel/toe walk, her gait was stable, her straight leg raising test was negative, and she had a full range of motion in her lumbar spine. (Id.) An X-ray of Plaintiff's lumbar spine taken that same day showed "mild degenerative changes; no definite alignment abnormalities . . . . Degenerative changes consistent of small anterior osteophytes." (R. at 230.) However, Dr. Webb noted that despite Plaintiff's complaints of chronic lower back pain since 1991, she had not had surgery, epidural injections, chiropractic therapy, or physical therapy. (R. at 226.)

As to Plaintiff's COPD, she underwent pulmonary testing on October 19, 2010. (R. at 231-32.) She had a "difficult time following commands" and experienced shortness of breath. (Id.) Plaintiff refused to go to the emergency room despite being advised to do so. (Id.) She was diagnosed with "mild restriction–possible." (Id.) During Plaintiff's April 4, 2011 examination at the Eastern Panhandle Free Clinic, she was positive for diminished breath sounds in her lungs. (R. at 282-83.) She was positive for shortness of breath again on June 2, 2011 when she was admitted to Jefferson Memorial Hospital. (R. at 349.) However, the ALJ noted that Plaintiff was not currently using any medication to treat COPD. (R. at 25.)

Defendant takes issue with the ALJ's credibility determination because the ALJ noted the following:

> A review of the documentary evidence further demonstrates the claimant stopped working for reasons not related to the disabling impairments she has alleged. During her consultative examination with Dr. Slaughter, the claimant related she stopped working in 2007 because she did not get along with her boss. . . . When questioning [sic] regarding subsequent employment, the claimant denied engaging in any work activity since 2007. Yet, a review of the claimant's earning record reflect self-employment income in the amount of $6,979.00 reported in the year 2011. . . .

29

> Equally telling is the claimant's admission that she has sought employment as a housekeeper since the disability onset date she has alleged. Upon questioning, the claimant acknowledged that she submitted job applications to a local motel for housekeeping positions. She stated she believed she was not hired due to her age, as opposed to the disabling symptoms she alleged. These discrepancies, when considered, in totality serves to further erode the claimant's credibility regarding her purported disabling functional limitations.

(R. at 26.) Plaintiff states that "unsuccessful attempts at work should not be credited against onset dates or substantial gainful employment." (Plaintiff's Brief at 13.) The undersigned disagrees with Plaintiff that the ALJ credited her attempts at work against onset dates or substantial gainful employment. Indeed, the ALJ did not even make a determination as to whether Plaintiff's self-employment was an unsuccessful attempt at work. As noted above, Plaintiff testified that she could not perform household chores without pain (R. at 21), yet she also testified that she had applied for housekeeping positions at a local motel, positions that would involve work substantially similar to household chores. Accordingly, the ALJ properly relied upon these internal inconsistencies within Plaintiff's testimony in determining that Plaintiff was not credible.

In sum, the undersigned finds that the ALJ complied with <u>Craig</u> and SSR 96-7p when assessing Plaintiff's credibility. He discussed her daily activities, location and intensity of her pain, aggravating factors, and medications and treatment used by Plaintiff to alleviate her pain. The ALJ also thoroughly discussed the medical evidence contradicting Plaintiff's subjective complaints. Accordingly, the undersigned finds that substantial evidence supports the ALJ's credibility determination, and Plaintiff's claim is without merit.

### E. Age

As her last claim for relief, Plaintiff alleges that "[e]ven assuming the ALJ correctly determined Plaintiff's residual functional capacity to be restricted to light work," he "failed to

consider that, at the time, Plaintiff met the definition of a 'person close to retirement'" because she was 60 years old at the time of her administrative hearing. (Plaintiff's Brief at 14-15.) According to Plaintiff, the ALJ should have considered her age at the time of the hearing and found her disabled. (Id.) Defendant asserts that Plaintiff's age is not relevant because the ALJ found that Plaintiff could perform her past relevant work as a fast food cashier. (Defendant's Brief at 14-15.)

> 20 C.F.R. § 416.968(d)(4) states:

> If you are closely approaching retirement age (age 60 or older) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

See also 20 C.F.R. Pt. 404, Subpt. P, App. 2–Medical Vocational Guidelines ("the Grids"), Rule 202.00(f). Nevertheless, the undersigned's findings above that substantial evidence supported the ALJ's finding at Step Four that Plaintiff could perform her past relevant work as a fast food cashier, both as she actually performed it and as generally performed in the regional and national economy, forecloses this argument. The Grids are only relevant at Step Five of the sequential evaluation process. See Gavigan v. Barnhart, 261 F. Supp. 2d 334, 338 (D. Md. 2003). "Where substantial evidence supports the ALJ's step four finding regarding [past relevant work], the ALJ was under no obligation to proceed to step five of the sequential analysis." Cook v. Colvin, No. 1:11-cv-87, 2014 WL 317847, at *4 (M.D.N.C. Jan. 29, 2014) (alteration in original) (citing Springirth v. Astrue, No. 5:10-00669, 2011 WL 4597366, at *6 (S.D. W. Va. Sept. 30, 2011) (rejecting plaintiff's argument that ALJ should have considered the Grids when ALJ decided that plaintiff was capable of performing past relevant work)). Accordingly, Plaintiff's argument is without merit.

## V.  RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation.  28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___6___ day of _April_  , 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE